UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------
KEISHONE JOHNSON,

                Plaintiff,

      -against-

BOARD OF EDUCATION RETIREMENT
SYSTEM OF THE CITY OF NEW YORK,
SANFORD RICH, DANIEL MILLER, and
RAYMOND ORLANDO,

                Defendants.
------

**MEMORANDUM & ORDER**
**18-CV-4605 (NGG) (PK)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Keishone Johnson served as the Manager of Infrastructure and Technical Services for the Information Technology ("IT") Department at the Board of Education Retirement System of the City of New York ("BERS") from April 27, 2015 until his termination on February 18, 2016. Johnson claims that he was fired in retaliation for constitutionally protected speech and in violation of New York's whistleblower protection statute; and that he was discriminated against as an African American in violation of the Equal Protection Clause of the Fourteenth Amendment, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NY-CHRL"). Defendant BERS, along with co-Defendants who hold senior leadership roles at the agency, moved for summary judgment on all claims. (*See* Defs.' Mem. in Supp. of Summ. J. ("Mem.") (Dkt. 32); Pl.'s Mem. in Opp. to Summ. J. ("Opp.") (Dkt. 33); Defs.' Reply ("Reply") (Dkt. 36).) For the following reasons, Defendants' motion is GRANTED and the complaint is DISMISSED with prejudice.

1

## I. BACKGROUND

The court constructs the following statement of facts from the parties' Local Rule 56.1 Statements and the admissible evidence submitted. (*See* Defs.' Rule 56.1 Statement of Undisputed Facts ("56.1") (Dkt. 30); Pl.'s Rule 56.1 Statement ("56.1 Resp.") (Dkt. 34); Defs.' Reply to Pl.'s Rule 56.1 Statement ("56.1 Reply") (Dkt. 37).) Except where otherwise noted, the following facts are undisputed. Where the parties allege different facts, the court notes the dispute and credits the Plaintiff's version if it is supported by evidence in the record. All evidence is construed in the light most favorable to the non-moving party with all "reasonable inferences" drawn in its favor. *ING Bank N.V. v. M/V Temara, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018).[1]

### A. Johnson's Hiring and Initial Salary Dispute

BERS is an agency established pursuant to New York Education Law § 2575 to administer retirement benefits for employees of the New York City Department of Education ("DOE"), other than full-time teachers, as well as employees of the School Construction Authority and certain other City agencies. (Am. Compl. (Dkt. 1-2) ¶ 7; Ans. (Dkt. 8) ¶¶ 7-8.) In April 2015, a committee consisting of Noro Healy, BERS's Director of Administration, Personnel, and Security; Harvey Gordon, BERS's Acting Executive Director; and Steven Wise, an IT consultant for DOE, hired Johnson to work as an IT Manager. (56.1 Resp. ¶ 10.) Around the same time, Healy assumed the position of Acting Director of IT, in addition to his permanent role, and served as Johnson's supervisor. (*See* Healy Aff. (Dkt. 35-2) ¶¶ 15-16.) Johnson's starting salary was $95,208, based on the salary of his predecessor in the position. (*See* 56.1 Resp. ¶¶ 11, 96; Email Chain of May 7-12, 2015 (Dkt 31-7).) Prior to working at BERS, Johnson worked as

---

[1] When quoting cases and unless otherwise noted, all citations and quotation marks are omitted, and all alterations are adopted.

a senior support analyst at WestwoodOne, which provides digital content to radio stations. (*See* 56.1 Resp. ¶ 6.) In that role, Johnson provided internal technical support and acted as a technical liaison to clients. (*Id.* ¶¶ 7-8.) His annual salary was approximately $50,000. (*Id.* ¶ 9.)

Johnson's starting salary at BERS, nearly twice what he made in the private sector, caught the attention of Lawrence Becker, who was Chief Executive of the Department of Human Resources at DOE, and of Defendant Raymond Orlando, who was DOE's Chief Financial Officer and the Chancellor's designee on the BERS Board of Trustees. (*Id.* ¶¶ 13-14.) About a week after Johnson began work, Healy emailed a member of Orlando's staff to inquire about the status of Johnson's hire. (*Id.* ¶ 16.) Orlando, concerned with the salary offered, directed DOE staff to withhold internal approval. (*Id.* ¶ 17.) Gordon and Healy then contacted the New York City Law Department, as well as two individual members of the BERS Board of Trustees, in an attempt to get Johnson approved and his salary released. (*Id.* ¶¶ 18-20.) Johnson, who began working at BERS on April 27, 2015, was not approved until June 8, and not paid until June 19, 2015. (*Id.* ¶¶ 21, 23.)

### B. SCI Investigation of Daniel Miller

From the outset, Healy advised Johnson to focus on the safety and security of BERS's organization and infrastructure. (*Id.* ¶ 26.) On June 18, 2015, Johnson wrote to Healy and Gordon that he had discovered that Defendant Daniel Miller had downloaded two external file storage and sharing networks, Dropbox and Evernote, as well as pirated movies to his work computer, where he was also keeping confidential employee information, including Social Security numbers, salary information, and employee identification numbers. (*Id.* ¶ 27; Email of June 18, 2015 (Dkt. 31-12); NYC Dep't of Investigation Report ("SCI Report") (Dkt. 31-13) at 2.) Johnson discovered the files during a routine check.

(*Id.*) At the time, Miller was the Benefits Administrator for BERS. (SCI Report at 1.) Defendant Sanford Rich, who was appointed Executive Director of BERS in January 2016, subsequently promoted Miller to Acting Director of IT, replacing Healy, in March 2016. (*See* SCI Report at 2, n.5; Am. Compl. ¶ 10.)

Upon receiving Johnson's report, Gordon contacted the Special Commissioner of Investigation for the New York City School District ("SCI"), which undertook a full investigation and later referred the matter to the New York City Department of Investigation ("DOI"). (*Id*; 56.1 Resp. ¶ 32.) In June 2016, DOI shared the findings of the SCI investigation with Rich. (*See* SCI Report; Am. Compl. ¶ 10.) The SCI Report found that Miller knowingly violated the agency's Information Technology/Security Policies and Procedures ("ITTP") and recommended that he be disciplined. (*Id.* at 4.) On that basis, Rich removed Miller as Acting Director of IT on July 8, 2016. (*See* 56.1 Resp. ¶ 33.) Despite his removal as Acting Director, Miller retained some of his substantive responsibilities and, in September 2016, he was promoted to Deputy Executive Director of BERS. (*See* Dep. of Daniel Miller (Dkt. 35-10) at 74:10-75:7.)

### C. Disputes Over CPMS

During Johnson's 10-month tenure at BERS, there was significant controversy over the implementation of an IT project called the Comprehensive Pension Management System ("CPMS"). (56.1 Resp. ¶¶ 36-37.) CPMS was designed to move all BERS members' data from outdated systems to newer technology. (*Id.*) The project began in 2009 with a $7 million budget and, by early 2017, remained incomplete and significantly over budget. (*See* SCI Report on CPMS Project ("SCI CPMS Report") (Dkt. 31-18); Dep. of Sanford Rich (Dkt. 35-11) at 70.) According to Sanford Rich, the BERS Board told him at the time of his hiring, in January 2016, that completing CPMS expeditiously should be his top priority. (56.1 Resp. ¶ 59.)

4

From the start, CPMS was led by an outside vendor, GJTZ LLC, whose principals were Gary Tunnicliffe and Jack Ziegler. (*See* 56.1 Resp. ¶ 39; SCI CPMS Report.) When Johnson started at BERS, Healy—his boss and the newly appointed Acting Director of IT—told him that he could work on CPMS "if [he] had the time to assist." (Dep. of Pl. (Dkt. 31-26) at 30:13-31:4.) GJTZ felt differently and communicated to Johnson that he was hired specifically for CPMS and was responsible for all technical matters related to it. (*Id.* at 30:17-19.) At roughly the same time, a BERS Trustee wrote to Raymond Orlando with regard to the delay of Johnson's official hiring that he was "deeply concerned that the CPMS project be delayed or worse at a grinding halt," suggesting that his view of Johnson's role was more in line with GJTZ's than with Healy's. (Email of Joseph D'Amico on May 19, 2015 (Dkt. 31-8).) Daniel Miller, then the Benefits Administrator, served as the internal lead for CPMS. (56.1 Resp. ¶ 42.) He also testified that Johnson's job was to work on the technical infrastructure for the project. (*Id.*; Dep. of Daniel Miller (Dkt. 31-29) at 15:4-17:14.)

In the Spring of 2015, Johnson raised numerous concerns about GJTZ, including that they were not providing him plans or updates on CPMS. (56.1 Resp. ¶ 44.) He also raised specific concerns about Vitech, a third-party software vendor engaged by GJTZ, whom Johnson believed was misrepresenting its products to the CPMS team. (*Id.* ¶¶ 46, 157.) Healy shared Johnson's critical view of GJTZ's management of CPMS, which he outlined in a letter to the BERS Board of Trustees in October 2015. (*Id.* ¶ 53; Email and letter from Noro Healy of Oct. 26, 2015 (Dkt. 31-19).)[2] Johnson also testified that Miller "did not have the City's

---

[2] Healy brought a suit similar to the case at bar against BERS, Orlando, and Rich. Judge I. Leo Glasser granted Defendants' motion for summary judgment and dismissed the case. *See Healy v. BERS et al.*, 17-cv-4016 (ILG)(PK), 2019 WL 1243791 (E.D.N.Y. Mar. 18, 2019).

5

interest at the forefront, his concerns were more for the wellbeing of GTJZ and their profitability." (56.1 Resp. ¶ 51.) On August 27, 2015, Johnson and Healy's allegations of mismanagement by GTJZ were echoed in an anonymous "concerned taxpayer" letter to DOI. (*Id.* ¶ 47; Anonymous Letter of Aug. 27, 2015 (Dkt. 31-17).) That letter prompted DOI to investigate and ultimately to conclude that the allegations were unsubstantiated. (*See* SCI CPMS Report at 1.)

Miller's view of CPMS differed from Johnson's and Healy's. He testified that Johnson was unable to perform certain key tasks that the project required and that Johnson's criticisms of the Vitech software were "nonsense." (Dep. of Daniel Miller (Dkt. 31-29) at 24:8-29:2.) Miller also disliked reporting to Healy, who he believed "had zero involvement in CPMS" and "no experience in BERS business operations whatsoever, so he couldn't even assess what needed to be done." (*Id.* at 21:10-16.)[3] When SCI investigated Miller for personal violations of BERS's technology policy, as discussed above, he asserted that Gordon and Healy had made the complaint against him, (based on Johnson's findings,) to jeopardize his chances for a promotion. (SCI Report at 3.)

After Miller's promotion to Acting Director of IT, Johnson claimed to him and a group of IT staff that GTJZ was engaged in "port scanning," an exercise in which a would-be cyber intruder probes a network to look for vulnerable points of entry. (56.1 Resp. ¶ 62; Dep. of Daniel Miller (Dkt. 31-29) at 102:6-103:2.) Miller felt the accusation was "nonsensical" because GTJZ already had access to the BERS network and would not need to engage in a port scanning attack to gain entry. (56.1 Resp. ¶ 62.) Johnson maintains that port scanning could have allowed GTJZ

---

[3] Tunnicliffe agreed with Miller's assessment and told Johnson that Healy, who had no background in IT before he became Acting Director, was not qualified for his job. (Dep. of Pl. (Dkt. 31-26) at 31:21-23; 56.1 Resp. ¶ 40.)

access to files that they would not otherwise have had, and that independent evidence corroborates his accusation. (*Id.*)

### D. Johnson's Termination

In early February 2016, Rich consulted with Lawrence Becker, Miller, Healy, and others about terminating Johnson. (*See* Email Chain of Feb. 2, 2016 (Dkt. 31-24).) Miller recommended that Rich fire Johnson because he did not believe him to be qualified or performing well. (*Id.* ¶ 64; Email Chain of Feb. 10, 2016 (Dkt. 31-25).) Rich responded that Miller's findings "raise[d] concerns . . . related to the maintenance of our systems and the IT Department since . . . the transfer of IT management responsibility to Noro Healy." (Email Chain of Feb. 10, 2015.) Tunnicliffe, who was not involved in the internal BERS process, also told Rich that "some corners" of BERS, including Healy, "have shown themselves to criticize the project no matter what." (Email from Gary Tunnicliffe of Feb. 5, 2016 (Dkt. 31-16).)

Rich testified that he had wanted to fire Johnson immediately, based on reports from a third-party contractor other than GTJZ. (*See* Dep. of Sanford Rich (Dkt. 31-30) at 103:7-24.) Becker advised Rich that Johnson was a provisional employee who could be terminated at will. (56.1 Resp. ¶ 66.) Healy disagreed with Miller and the others, advising Rich that he found Johnson to be fit for his position, adding: "Do note that I am the OEO [Office of Equal Opportunity] officer for BERS and based on these circumstances I deem that there are not sufficient grounds for termination." (Email from Noro Healy of Feb. 2, 2016 (Dkt. 31-24).)

On February 18, 2016, Rich summoned Johnson to his office and told him that his employment was terminated. (56.1 Resp. ¶¶ 71, 77.) Miller was also present at the meeting. (*Id.*) During the meeting, Rich commented that his office was so bright and warm that BERS could make money by growing marijuana in it. (*Id.* ¶ 77.) Johnson interpreted the comment to be racially motivated

7

because he and Miller are both African American and Johnson wears his hair in dreadlocks. (*Id.*)

Following Johnson's termination, on March 3, 2016, Rich demoted Healy from his position as Director of HR. (*Id.* ¶¶ 72-73.) Healy retired soon after rather than incur a $70,000 salary decrease, which would have also affected his retirement benefits. (*Id.* ¶¶ 73-74.) Subsequent to Healy's retirement, Miller was promoted to Deputy Executive Director of BERS. (*Id.* ¶ 75.)

In June 2017, Healy brought an action claiming retaliation for speech protected by the First Amendment and the New York whistleblower protection law, as well as racial discrimination. *See Healy v. BERS et al.*, 17-cv-4016 (ILG)(PK), 2019 WL 1243791 (E.D.N.Y. Mar. 18, 2019). The case was dismissed after Defendants successfully moved for summary judgment. *Id.* at *1. Johnson brought this suit, alleging substantially the same, in May 2018. (*See* Am. Compl.)

### E. Alleged Pattern of Racial Discrimination

As part of his claim for racial discrimination, Johnson alleges a pattern of adverse employment actions against African American employees by BERS and its leadership. As relevant here, Sanford Rich is white. (Am. Compl. ¶ 40.) Healy and Johnson are African American. (*Id.* ¶¶ 5, 12, 40-41.) Gordon, who served as Acting Executive Director and General Counsel, was a finalist for the permanent Executive Director job, and resigned after Rich's appointment, is African American. (*Id.* ¶ 12; 56.1 Resp. ¶ 181.) Miller, whom Rich promoted twice, first to replace Healy and then to the position of Deputy Executive Director, is African American. (56.1 Resp. ¶ 61.)

In addition to Healy, Gordon, and himself, Johnson identifies other African American BERS employees who allegedly suffered adverse employment actions, including: Rohan Wint, who reported to Johnson and was demoted on the same day Johnson

8

was terminated; Jaclyn Durant, whom Healy hired as an Associate Director on his team and who was dismissed; and Laurence Jennings, a computer systems manager who was dismissed. (56.1 Resp. ¶¶ 215, 223-226, 231.)

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). "The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried. In determining whether summary judgment is appropriate, this court will construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." *Figueroa v. Mazza*, 825 F.3d 89, 98 (2d Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The movant may discharge its initial burden by demonstrating that the non-movant "has 'failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 255 F. Supp. 3d 443, 451 (S.D.N.Y. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). While the court must draw all inferences in favor of the non-movant, the non-movant "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995). Finally, the court is mindful that the Second Circuit "has long recognized the need for caution about granting summary judgment to an

employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016). Nevertheless, "[t]hough caution must be exercised in granting summary judgment where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 40 (2d Cir. 1994).

### III. DISCUSSION

#### A. Retaliation for Protected Speech

##### 1. First Amendment Claim

The First Amendment applies to public employees and protects their right "to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). However, "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Id.* at 418. "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Id.*

"To determine whether or not a [public employee] plaintiff's speech is protected, a court must begin by asking 'whether the employee spoke as a citizen on a matter of public concern.'" *Sousa v. Roque*, 578 F.3d 164, 170 (2d Cir. 2009) (quoting *Garcetti*, 547 U.S. at 418). A public employee speaking pursuant to his or her official duties is not speaking as a citizen and, consequently, that speech is not protected by the First Amendment. *See Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 201 (2d Cir. 2010). "The objective inquiry into whether a public employee spoke pursuant to his or her official duties is a practical one." *Id.* at 202. "[S]peech can be pursuant to a public employee's official job duties even though it is not required by,

or included in, the employee's job description, or in response to a request by the employer." *Id.* at 203.

In *Weintraub*, a classroom teacher filed a grievance with his union when the Assistant Principal, his supervisor, failed to discipline a student who had thrown a book at him. *See id.* at 199. Weintraub alleged that he was retaliated against for filing that grievance and brought a First Amendment claim after he was terminated from his position. *See id.* The Second Circuit held that Weintraub was acting pursuant to his job duties when he filed the report because maintaining classroom discipline "is an indispensable prerequisite to effective teaching and classroom learning," and therefore was necessarily part of his duties as a classroom teacher. *Id.* at 203. The court also found relevant the form of Weintraub's speech, reasoning that "a union grievance is not a form or channel of discourse available to non-employee citizens, as would be a letter to the editor or a complaint to an elected representative or inspector general." *Id.* at 204.

By contrast, in *Dillon v. Suffolk Cty. Dep't of Health Servs.*, the court held that a doctor working in a county correctional facility was not acting pursuant to her position when she reported mistreatment of patients to her immediate supervisors, as well as to the Chief Deputy County Executive, an administrator with Suffolk County Health Services, and representatives of the Suffolk County District Attorney, including the Government Corruption Bureau Chief. *Dillon v. Suffolk Cty. Dep't of Health Servs.*, 917 F. Supp. 2d 196, 208-211 (E.D.N.Y. 2013). Distinguishing *Weintraub*, the court found that Dr. Dillon's "complaints referred to systemic mistreatment and corruption extending outside of her own personal duties and affecting inmates with whom she had no personal or job connection." *Id.* at 210. The court also noted that her speech "had citizen analogues" because it was "not part of an established internal communication method" and, in some

11

cases, "Dr. Dillon lodged her grievances through channels of discourse that are available to non-employee citizens." (*Id.* at 211-12.)

Here, Johnson claims that he engaged in First Amendment protected speech when he reported Miller's violations of BERS's technology usage policy and when he raised concerns about the CPMS project and GTJZ's project management. The court disagrees and finds that in both instances Johnson was acting pursuant to his official duties, not speaking as a citizen. Therefore, his First Amendment claim fails.

As Johnson testified, Healy tasked him with protecting the safety and security of BERS's organization and infrastructure. To that end, Johnson told investigators that he performed routine checks of BERS employees' computer drives. During one of those routine checks he discovered improper files stored on Miller's work computer. Johnson argues that because his discovery led to an investigation by SCI, which serves as the Inspector General for BERS, he was reporting to an independent watchdog rather than acting within the scope of his job responsibilities. (*See* Opp. at 3.) But Johnson only reported Miller to Healy and Gordon; Gordon brought the matter to SCI. Johnson was performing a routine security check, part of his core job function, and reported a finding to his immediate supervisors. Because he was reporting on a core job function within an established internal channel of communication, Johnson was not speaking as a citizen and his speech is not protected by the First Amendment.

Johnson's communications around his work on the CPMS project and his concerns with GJTZ were also pursuant to his immediate job responsibilities, not systematic concerns akin to citizen speech. *See Dillon*, 917 F. Supp. 2d at 210. The record shows that BERS Board members, the Executive Director, and the CPMS project lead all understood CPMS to be a part of Johnson's job as an IT manager. Johnson's contention that his role was "limited to

12

providing technical support" for the project is unavailing because CPMS was an IT project. (*See* 56.1 Resp. ¶ 147.) Johnson's concerns that BERS could be subject to a "port scanning" attack by a vendor working on CPMS illustrates how the project was inextricably linked to Johnson's responsibility for protecting the security of BERS's infrastructure. No reasonable view of the evidence supports the conclusion that Johnson's work on CPMS was outside of his professional duties. *See Dillon*, 917 F. Supp. 2d at 210.

In addition, like the plaintiff in *Weintraub*, and unlike the plaintiff in *Dillon*, Johnson's communications were internal to the agency, "for which there [is] no citizen analogue." *Id.* at 207. The fact that an anonymous "concerned taxpayer" wrote to DOI with concerns about CPMS that mirrored Johnson's may be evidence that CPMS was "an issue of public concern;" however, it is not evidence that Johnson was "speaking as a citizen" when he spoke about CPMS to his superiors within BERS. *See Garcetti*, 547 U.S. at 418. Johnson could have expressed his concerns in a form available to the public, but he did not. *See Weintraub,* 593 F.3d at 204. Although Johnson testified that he also relayed his concerns to an employee of the New York City Department of Information Technology and Telecommunications, as well as an IT auditor at the New York State Department of Financial Services, there is no indication in the record of any follow up from those complaints, no documentation of those complaints, nor any evidence that anybody connected with Johnson's termination was aware of those complaints. (*See* 56.1 Resp. ¶¶ 162-164.)

Based on *Garcetti* and its Second Circuit progeny, the court finds that Johnson was not speaking as a citizen when he reported Miller's improper use of technology or when he spoke out about alleged problems with the CPMS project. Therefore, his speech was not constitutionally protected by the First Amendment.

13

### 2. Whistleblower Retaliation Claim

Johnson also claims that his termination was a violation of New York's whistleblower protection statute, Civil Service Law § 75-b, which provides:

> A public employer shall not dismiss or take other disciplinary or other adverse personnel action against a public employee regarding the employee's employment because the employee discloses to a governmental body information: (i) regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action.

N.Y. Civ. Serv. Law § 75-b(2)(a) (McKinney). The statute defines "governmental body" as:

> (i) an officer, employee, agency, department, division, bureau, board, commission, council, authority or other body of a public employer, (ii) employee, committee, member, or commission of the legislative branch of government, (iii) a representative, member or employee of a legislative body of a county, town, village or any other political subdivision or civil division of the state, (iv) a law enforcement agency or any member or employee of a law enforcement agency, or (v) the judiciary or any employee of the judiciary.

N.Y. Civ. Serv. Law § 75-b(1)(c).

For reasons similar to the First Amendment analysis discussed above, the court finds that Johnson did not make a report "to a governmental body" as the statute requires. Instead, Johnson communicated his internal dissent regarding matters within the ambit of his employment. Recent caselaw and legislative history confirm that not every issue raised internally by a public employee qualifies as a disclosure protected by Section 75-b.

The New York Court of Appeals has counseled that when applying the statute, "courts should use their discretion in determining whether the overall actions of the plaintiff constitute a good faith effort to report [] misconduct." *Tiplado v. Lynn*, 26 N.Y.3d 204, 212 (2015). *Tipaldo* concerned an earlier version of the statute which required a complainant to notify his or her supervisor before making an external complaint of wrongdoing. "The purpose of the reporting requirement was to allow the employer the opportunity to cease the violations by providing internal notice prior to disclosing misconduct to an outside agency." *Id.* at 211. However, that requirement posed problems when a whistleblower's superiors were the alleged wrongdoers, as they were in *Tipaldo*. The court held that "[u]nder [those] particular circumstances, strict compliance with the reporting requirements of Civil Service Law § 75-b would not serve the purpose of the statute," and that instead courts should employ the flexible "good faith effort" standard. Two months after *Tipaldo*, on December 28, 2015, the Governor signed L. 2015, ch. 585, repealing the internal reporting requirement of Civil Service Law § 75-b(2)(b). That law's purpose was "[t]o remove the requirement that public employee whistleblowers first notify their supervisors of the improper activity, in order to protect employees where it is the supervisors themselves who are engaged in the improper activity which the whistleblower seeks to report." Sponsor's Mem. of Supp., Bill Jacket, L. 2015, ch. 585 at 6.

Given that context, Johnson's communications to his supervisors within the agency where he was employed do not constitute a "disclos[ure] to a governmental body" within the meaning of Section 75-b(2)(a). If communication with internal supervisors qualified as a disclosure to a governmental body, then the requirement that a complainant report internally "[p]rior to reporting" a protected complaint would have been superfluous. *See Tipaldo*, 26 N.Y.3d at 211. Any disclosure would have been protected by the Civil Service Law as soon as the complainant

raised the issue of wrongdoing to his or her supervisor. The most sensible reading of the text and caselaw is that the crucial inquiry is whether the speaker intended to blow the whistle on wrongdoing or, rather, whether the speech was simply raising issues about matters relating to the complainant's job. Here, the court finds the latter. Johnson did not avail himself of any channel available to him to make a whistleblower complaint. Instead, Johnson spoke to BERS colleagues about a high priority project within his responsibilities that was clearly the source of internal division. Because Johnson never made the kind of complaint covered by Civil Service Law § 75-b, he cannot state a claim under that statute.

### B. Racial Discrimination

#### 1. Equal Protection and NYSHRL Claims

Johnson's claims of racial discrimination under the Equal Protection Clause of the 14th Amendment pursuant to 42 U.S.C. § 1983, and under the New York State Human Rights Law ("NYSHRL"), are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[4] *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). To make a *prima facie* claim of racial discrimination, a plaintiff must show: (1) he is a member of a protected class, (2) he was qualified for the position he held, (3) he suffered an adverse employment action, and (4) the circumstances surrounding the adverse action give rise to an inference of discriminatory intent. *See Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004). "The burden that an employment discrimination plaintiff must meet in order to defeat summary judgment at the *prima facie* stage is *de minimis.*" *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997). If the plaintiff makes a prima facie showing, the burden

---

[4] Johnson withdrew his claim for racial discrimination under 42 U.S.C. § 1981. (*See* Opp. at 16, n.6.)

shifts to the defendant to proffer a nondiscriminatory rationale for its conduct. *See Feingold*, 366 F.3d at 152. If the defendant meets its burden, "to defeat summary judgment the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Id.*

Johnson has met the low bar for a *prima facie* claim. He is an African American, he was selected for his role by an internal committee over other candidates, and he was terminated over the objection of Healy, who served as his immdiate supervisor during most of his tenure at BERS. Healy also raised concerns about Johnson's termination in his capacity as the agency's OEO officer. Likewise, Defendants have met their burden based on the feedback that Rich received from Miller and others that Johnson lacked the technical capacity to succeed in his role and was not aligned with leadership on the CPMS project, which was Rich and Miller's top priority. The case turns on whether a reasonable juror could conclude that BERS's nondiscriminatory rationale for terminating Johnson was a pretext based on the evidence Johnson has marshalled.

Johnson has only one piece of evidence that could be construed as directly evincing discriminatory intent: Rich's comment that he could grow marijuana in his office. Johnson claims that Rich would not have made that statement had he not been in a meeting with two African Americans, Johnson and Miller, one of whom had his hair in dreadlocks. Even if Johnson is correct, however, Rich's comment—though awkward and inappropriate—is not enough to sustain Johnson's discrimination claim over the specific professional criticisms upon which Rich claims to have based his decision to terminate him. Defendant Orlando's objections to Johnson's starting salary also cannot sustain any inference of discrimination, as the record provides

17

ample evidence that his concern was specifically that Johnson's salary was nearly double what he had been earning in the private sector.

Beyond the marijuana comment and the dispute over his starting salary, Johnson's claim relies entirely on gleaning discriminatory itent from adverse employment actions taken against African American employees Gordon, Healy, Wint, Durant, and Jennings. The circumstances involving those individuals, based on the evidence in the record, do not establish a pattern of discrmination. Gordon resigned voluntarily after Rich was hired for the role of Executive Director of BERS, a position for which Gordon had been a finalist. A judge of this court has already found that Healy's termination was not racially motivated. *See Healy*, 2019 WL 1243791 at *4. As for the others, Johnson has not submitted evidence about their terminations that is sufficient to overcome the neutral rationales proffered, with supporting evidence, by Defendants. Therefore, Johnson's claim fails at the third step of the *McDonnell Douglas* inquiry.

      2.   NYCHRL Claim

The New York City Human Rights Law ("NYCHRL") employs a different standard than its federal and state analogues. Under the NYCHRL's heightened protections, a plaintiff need only "be treated less well" than other employees because of race to make a claim. *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 110 (2d Cir. 2013); *see also Johnson v. Strive E. Harlem Emp. Grp.*, 990 F. Supp. 2d 435, 445 (S.D.N.Y. 2014). For the reasons discussed above, the court finds that Johnson has failed to identify evidence to show that his termination was motivated, even in part, by improper discrimination. *See Estate of Hamilton v. City of New York*, 627 F.3d 50, 56 (2d Cir. 2010).

## IV. CONCLUSION

For the foregoing reasons, Defendants' (Dkt. 29) Motion for Summary Judgment is GRANTED with prejudice. The Clerk of the Court is respectfully DIRECTED to enter judgment for Defendants and close the case.

SO ORDERED.

Dated:   Brooklyn, New York
         May 11, 2021

                                              /s/ Nicholas G. Garaufis
                                             NICHOLAS G. GARAUFIS
                                             United States District Judge

19